UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Apollyon Kennedy-Bey,                           Court File No. 15-cv-2627 (DWF/LIB)

               Plaintiff,

v.                                              **ORDER AND**
                                                **REPORT AND RECOMMENDATION**
Metropolitan Council, et al.,

               Defendants.

---

This matter comes before the undersigned United States Magistrate Judge upon Defendants' Motion for Summary Judgment, [Docket No. 56], and upon referral from the Honorable Donovan W. Frank. (Order of Reference [Docket No. 54]). A hearing was held on October 17, 2016, after which the motion was taken under advisement. [Docket No. 85].

For the reasons discussed herein, the Court recommends that Defendants' Motion for Summary Judgment, [Docket No. 56], be **GRANTED** and that the Plaintiff's Complaint, [Docket No. 1], be **DISMISSED with PREJUDICE**.

For the reasons discussed herein, the Court Orders that Plaintiff's Motion for Discovery and Inspection of Evidence, [Docket No. 70],[1] is **DENIED**; Plaintiff's other documents seeking discover directly from Defendants, [Docket Nos. 71–74], are **STRICKEN as untimely filed**; Plaintiff's Affidavit of Fact, [Docket No. 77],  and Form 19 Request, [Docket No. 82], are **STRICKEN as untimely filed**; Plaintiff's Affidavit in Response to Defendants' Motion for Summary Judgment, [Docket No. 79], and Plaintiff's Affidavit of Truth, [Docket No. 80], are **STICKEN as untimely filed**; Plaintiff's Affidavit of Fact, [Docket No. 78], Plaintiff's Affidavit of Truth re Jennie Brown, [Docket No. 81], and Plaintiff's Contract Termination Notice, [Docket

---

[1] Docket No. 70 is actual entitled "Defendants' Motion for Discovery and Inspection of Evidence;" however, it is actually Plaintiff's motion.

No. 84], are **STICKEN as filed in error**; Plaintiff's Affidavit in Opposition to Defendants'

Motion for Summary Judgment, [Docket No. 86], Plaintiff's Declaration, [Docket No. 87], and

Plaintiff's Affidavit order, [Docket No. 88], are **STRICKEN as untimely filed**; Plaintiff's

document entitled Defendants' Response to Plaintiff's Interrogatories, [Docket No. 90], is

**STRICKEN as untimely filed**; Plaintiff's Affidavit to Amend Response to Defendant's Motion

for summary Judgment, [Docket No. 92], and the second copy of Plaintiff's Affidavit to Amend

Response to Defendant's Motion for summary Judgment, [Docket No. 93], are **STRICKEN as**

**untimely filed**; Plaintiff's Amended Complaint, [Docket No. 96], is **STRICKEN as filed in**

**error**; Plaintiff's Affidavit to Amend Complaint, [Docket No. 97], is **STRICKEN as untimely**

**filed**; and Plaintiff's second Application to Proceed in District Court Without Prepaying Fees or

Cost, [Docket No. 98], is **DENIED**.

## I.      STATEMENT OF FACTS

Plaintiff Apollyon Kennedy-Bey ("Plaintiff") initiated the present case on June 2, 2015,

naming as Defendants the Metropolitan Council, Officer Emmanuel Martinez-Cruz, Officer John

Steele, Officer Matthew Brake, and Officer Timothy Asp. (Compl. [Docket No. 1]). Plaintiff

alleged that each of the named Defendants was an employee of the Metropolitan Transit Police.

(Id. at ¶ 6). In his Complaint, Plaintiff demands relief pursuant to 42 U.S.C. § 1983, alleging that

Defendants "deprived [Plaintiff] of his civil rights secured by the United States Constitution and

laws and statutes thereunder including the Fourth Amendment forbidding unreasonable search

and seizures." (Id. at ¶ 1). Count I of Plaintiff's Complaint generally references claims of the use

of excessive force, unreasonable search and seizure, and unlawful arrest in violation of 42 U.S.C.

§ 1983. (Id. at Count I). As relief, Plaintiff seeks compensatory damages and punitive damages

as well as injunctive and declaratory relief. (Id. at Prayer for Relief).

Plaintiff asserts that Defendants, collectively, "deprived [Plaintiff] of his right to be free from excessive force and unreasonable search and seizure when he [w]as unreasonably searched, his property unreasonably seized, the subject of excessive force, and unlawfully arrested without probable cause or any legal justification." (Id. at ¶ 33). Specifically, Plaintiff alleges that after he boarded a Metropolitan Transit lite rail train on July 3, 2014, and while he was talking to another individual on the train, Officer Martinez told Plaintiff to "shut up" and asked Plaintiff for his train fare which Plaintiff alleges he gave to Officer Martinez. (Id. at ¶ 12). After Officer Martinez allegedly balled up the fare ticket, Plaintiff offered to get off the train at the next stop at which time Plaintiff alleges Officer Martinez asked for Plaintiff's identification, searched Plaintiff over his objections, and allegedly took Plaintiff's utility knife and money. (Id. at ¶¶ 12–14). Plaintiff alleges that after Officer Martinez told Plaintiff to sit down, Plaintiff again said he would get off the train and began walking toward the exit at which time Officer Martinez allegedly applied a taser to Plaintiff's back. (Id. at ¶¶ 16–17). Plaintiff alleges that he was tased two additional times while he was attempting to ask what he had done wrong. (Id. at ¶¶ 18–19). During the incident Officer Steel arrived, and Plaintiff alleges he tased Plaintiff "several more times in his right leg." (Id. at ¶ 21). Plaintiff alleges that he was handcuffed while Officer Steele had his knee on Plaintiff's neck and back, and that the officers then threw Plaintiff off the train down onto the platform. (Id. at ¶¶ 22–23).

After Plaintiff was on the platform, Officer Brake arrived at which time Plaintiff alleges that Officer Brake kicked Plaintiff and again threw him to the ground causing a cut to Plaintiff's chin. (Id. at ¶ 23a). Plaintiff alleges that several unspecified officers hit him in the head several times, and that during the incident several of his belongings were kicked off the platform. (Id. at ¶¶ 24–25).

Ultimately, Plaintiff alleges he was taken to the Ramsey County Adult Detention Center where he was allegedly held for five days before he was released. Plaintiff alleges that no criminal charges were ever filed against him. (Id. at ¶ 27).

On September 2, 2016, Defendants filed the present Motion for Summary Judgment. [Docket No. 56]. Accompanying their Motion for Summary Judgment, [Docket No. 56], Defendants submitted the transcript of Plaintiff's deposition, [Docket No. 59-1]; ten videos[2] which depict the incident at issue; and the affidavit of Defendant Steele, [Docket No. 60], which has attached to it Defendant Steele's incident report, [Docket No. 60-2]; Defendant Martinez-Cruz's incident report, [Docket No. 60-3]; Defendant Brake's incident report, [Docket No. 60-5]; Defendant Asp's incident report, [Docket No. 60-6]; and a supplemental incident report, [Docket No. 60-7].

On September 7, 2016, the Court set a briefing schedule which ordered Plaintiff to respond to Defendants' motion for summary judgment by no later than September 23, 2016. (Order [Docket No. 63]). Plaintiff filed five documents before the expiration of his court ordered time to respond to Defendants' motion for summary judgment. (See, [Docket Nos. 62, 64–67]). Plaintiff's Affidavits of Fact, [Docket No. 64, 65], which are duplicative of one another, are the only of those documents which even ostensibly relate to Defendants' motion for summary judgment. Plaintiff's Affidavits of Fact, however, are merely summarizations of his Complaint

---

[2] Defendants submitted ten (10) videos in six (6) exhibits. (Steele Aff., [Docket No. 60], Exhibits 1, 4, 5, 6, 7, 11). Exhibit 1 contains the video from five different cameras inside the train where the incident alleged in Plaintiff's Complaint began to transpire. The Court will refer to these cameras as Train Video 1, Train Video 2, Train Video 3, Train Video 4, and Train Video 5. Exhibit 4 is a video from a camera on the platform outside the train from which Plaintiff was removed. The Court will refer to the video in Exhibit 4 as Platform Video 1. Exhibit 5 is also a video from a camera on the platform outside the train from which Plaintiff was removed. The Court will refer to the video in Exhibit 5 as Platform Video 2. Exhibit 6 is also a video from a camera on the platform outside the train from which Plaintiff was removed. The Court will refer to the video in Exhibit 6 as Platform Video 3. Exhibit 7 is also a video from a camera on the platform outside the train from which Plaintiff was removed. The Court will refer to the video in Exhibit 7 as Platform Video 4. Exhibit 11 is the video from the camera pointed out of Defendant Brake's squad car, and the Court will refer to this video as the Squad Car Video.

listed as "facts" in affidavit form with a purported calculation of damages attached. (See, Id.). The Affidavits of Fact do not respond to Defendants' motion for summary judgment or provide any admissible evidence which contests or refutes any of the material facts, affidavits, or videos as presented by Defendants in support of their motion for summary judgment. (Id.). Moreover, it is unclear whether the affidavit itself is signed and notarized or if only the calculation of damages is signed and notarized. (See, Id.).

As more fully discussed in Section III, infra, Plaintiff also continued to file a number of documents after his time to respond to Defendants' motion for summary judgment had expired, including materials filed October 17, 2016, the day of the hearing on the present motion and even beyond that date while the present dispositive motion was pending before this Court. Those untimely materials include a document entitled Affidavit in Response to Defendants' Motion for Summary Judgment, [Docket No. 79], and an Affidavit of Truth, [Docket No. 80], which accompanied that response.[3] Plaintiff's response, however, is largely irrelevant and non-responsive to Defendants' motion for summary judgment. (See, Affidavit in Response to Defendants' Motion for Summary Judgment, [Docket No. 79]; Affidavit of Truth, [Docket No. 80]). A review of the Plaintiff's untimely response shows that Plaintiff did not contest or refute any of the material facts, affidavits, or videos as presented by Defendants in support of their motion for summary judgment. (Id.). Plaintiff only summarized his Complaint and asserted generically and conclusorily that "[t]here was no probable cause for the arrest" because the "charges were later found to be found [sic] without merit and the charges were dismissed." (Id. at 1). Although those documents will be stricken as untimely, see Section III, infra, their content

---

[3] Plaintiff's Affidavit of Truth, [Docket No. 80], is duplicative of Plaintiff's previous Affidavits of Truth, [Docket Nos. 64, 65], and again purports to summarize his Complaint in affidavit form and list each paragraph as "fact" which will purportedly be deemed true if not refuted within ten days.

does not address the present motion nor does it properly contest or refute any of the material facts, affidavits, or videos as presented by Defendants in support of their motion for summary judgment.

As Plaintiff has not properly contested or refuted any of the material facts, affidavits, or videos as presented by Defendants in support of their motion for summary judgment, the Court treats the facts present by Defendants in support of their motion for summary judgment as undisputed.[4] The Court describes those facts below.

Defendant Steele,[5] in his affidavit, averred that he attempted to place Plaintiff under arrest after he observed Plaintiff yelling "I'll kill you right here" to another passenger, he observed that Plaintiff had a box cutter in his possession, and Plaintiff resisted Defendant Steele's commands. (Steele Aff., [Docket No. 60], at ¶ 1). Defendant Steele also avers that he had safety concerns for himself and others on the train due to the fact that he had previously found a utility knife in Plaintiff's possession, he was unaware if Plaintiff had any further weapons, and Plaintiff had previously threatened to kill another passenger. (Id.).

As noted above, Defendants also filed, under seal, the ten videos depicting the incidents which gave rise to the present case. (Steele Aff., [Docket No. 60], Ex. 1, 4, 5, 6, 7, 11). Each video depicts the incidents from a different angle as the incident progresses. (Id.). In each video, Plaintiff is identifiable as the individual wearing a pink and white shirt. (Compl., [Docket No. 1], at ¶ 15).

---

[4] The Court notes that Plaintiff was previously cautioned that his pro se status going forward in the present case would not relive him of his obligation to comply with substantive and procedural law or the Orders of this Court. (May 23, 2016, Motions Hearing, Digital Recording at 2:59–3:04 p.m.). Plaintiff acknowledged his obligations, and he acknowledged that he understood that the prior Orders and schedules of this Court would remain in place and in effect. (Id.).

[5] Although Plaintiff's Complaint asserts that Defendant Martinez-Cruz first initiated contact with Plaintiff, it is Defendant Steele who firsts interacts with Plaintiff. The videos and incident reports make clear that Defendant Steele, not Defendant Martinez-Cruz, was the first to initiate contact with Plaintiff.

Upon entering the crowded train, Plaintiff looked for a seat, but he remained standing as he could not locate an open seat. (Train Video 5, [Docket No. 60], Exhibit 1 at 23:29). Plaintiff began talking to a family seated next to the train door until the next stop when they exit. (Id. at 23:29–23:31). Plaintiff then began talking to a young couple who were seated beside where he stood, and Plaintiff took the seat next to the couple. (Id. at 23:31). Plaintiff continued to talk to the young couple, but all of what Plaintiff said cannot be entirely heard. (Id. at 23:31–23:34).[6] As the volume of Plaintiff's speech became more elevated, Plaintiff stood, continued to speak loudly, and swayed while he is holding onto to a grab rail. (Id. at 23:33–23:36:10). Plaintiff can be heard loudly exclaiming phrases such as "anybody in here, anybody . . . I'll tell anybody in here," at which point Plaintiff looks toward another passenger on the train and yells "Shut up. Shut up. Shut up. I will kill you right here. Shut up." (Id. at 23:36:10–23:36:42). While Plaintiff did not move towards the passenger he threatened to kill, he did move his arms in his direction, leaned in the passenger's direction, and continued to excitedly move his arms while he spoke. (Id.).

Upon hearing Plaintiff yell and observing a box cutter hanging from Plaintiff's front pocket, Defendant Officer Steele advanced toward the portion of the train where Plaintiff was standing, and he stood approximately one foot from Plaintiff while Plaintiff continued to speak loudly. (Steele Aff., [Docket No. 60-2], Exhibit 2, Steel Incident Report; Train Video 1, [Docket No. 60], Exhibit 1 at 23:36–23:37:14). From that distance, Defendant Steele's incident report noted that he could smell a strong odor of alcoholic and observed that the people around Plaintiff appeared "disturbed." (Train Video 5, [Docket No. 60-1], Exhibit 1 at 23:37; Steele Aff.,

---

[6] While the bulk of Plaintiff's speech to the young couple cannot be heard, Plaintiff can be heard saying certain words and expressions, such as "Barack Obama," "everyone on this train," "we all niggers," "look up the case law United States v. United States . . . and then get you a Black's Law Dictionary, look up the word person. A person is an entity, a corporation. . . your social security card is all capital letters, your birth certificate is all capital letter . . . ." (Id. at 23:31–23:34).

[Docket No. 60-2], Exhibit 2, Steel Incident Report). Defendant Steele also observed that the other passengers around Plaintiff seemed to be "disturbed by what he was yelling." (Steele Aff., [Docket No. 60-2], Exhibit 2, Steel Incident Report). Defendant Steele interrupted Plaintiff and told Plaintiff he was going to take the box cutter while Defendant Steele spoke to him. (Steele Aff., [Docket No. 60-2], Exhibit 2, Steel Incident Report). Defendant Steele then took the box cutter from Plaintiff. (Train Video 5, [Docket No. 60], Exhibit 1 at 23:37–23:37:15). Defendant Steele asked Plaintiff for his identification and Plaintiff complied, and Plaintiff attempted to explain he was only having a conversation with the couple in front of Plaintiff. (Steele Aff., [Docket No. 60-2], Exhibit 2, Steel Incident Report). While Defendant Steele reviewed Plaintiff's identification papers, Plaintiff continued to speak to the couple seated across from Plaintiff although the couple appeared to be attempting to ignore Plaintiff as they tried to look at their hands and towards the front of the train instead of looking at Plaintiff while he spoke. (Train Video 5, [Docket No. 60], at 23:37:40–23:38:40).

Defendant Steele then asked Plaintiff for his proof of fare. (Steele Aff., [Docket No. 60-2], Exhibit 2, Steel Incident Report). Plaintiff eventually provided Defendant Steel with a purported proof of fair, but upon review of the ticket, Defendant Steele informed Plaintiff that his proof of fare had expired. (Train Video 5, [Docket No. 60], Exhibit 1 at 23:38:40–23:41). Defendant Steele then asked Plaintiff for some additional information, and he asked Plaintiff to sit down while Defendant Steele checked for outstanding warrants over the radio. (Steele Aff., [Docket No. 60-2], Exhibit 2, Steel Incident Report; Train Video 5, [Docket No. 60], Exhibit 1 at 23:41–23:42:45). Plaintiff initially complied by sitting down, but then he stood up and moved towards the train door in an apparent attempt to exit the train. (Train Video 5, [Docket No. 60], at 23:42:45–23:43). Defendant Steele commanded Plaintiff to take a seat, but Plaintiff did not

comply; instead, Plaintiff took hold of the grab bar to resist being guided back to the seat. (Train Video 5, [Docket No. 60-1], Exhibit 1 at 23:43–23:43:05).

Defendant Steele then told Plaintiff to have a seat or Defendant Steel would place him under arrest. (Train Video 5, [Docket No. 60], Exhibit 1 at 23:43:05–23:43:12). Plaintiff did not comply, and Defendant Steele commanded him to place his hands behind his back. (Id.). Instead, Plaintiff pulled his wrist from Defendant Steele's grasp, spun to face Defendant Steele, asked what he did, and sat back down in his seat. (Id.). Defendants Steel then drew his taser, and Defendant Officer Martinez-Cruz began advancing from the rear of the train towards Defendant Steele and Plaintiff. (Id.).

Defendant Steele instructed Plaintiff to comply with his commands to get on the ground or he would be tased. (Id. at 23:43:12–23:43:16). Plaintiff, however, did not comply, and remained seated with his arms in front of him. (Id.). Defendant Martinez-Cruz reached Plaintiff and secured Plaintiff's right arm in an attempt to get him on the ground. (Id. at 23:43:14–23:43:19). Defendants Steele and Martinez-Cruz each grasped one of Plaintiff's arms and were able to get him to the ground despite his resistance. (Id. at 23:43:19–23:43:21). Plaintiff continued to refuse to comply with the officers' commands by bracing his arms underneath himself so he cannot be placed flatly on the ground. (Train Video 4, [Docket No. 60], Exhibit 1 at 23:43:21–23:43:25). Defendant Steele warned Plaintiff that he was going to be tased. (Id.). Plaintiff did not comply. (Id.). Defendant Steele then tased Plaintiff. (Train Video 4, [Docket No. 60], Exhibit 1 at 23:43:25–23:43:29). Plaintiff continued to struggle with the officers and ignored commands to place his hands behind his back. (Steele Aff., [Docket No. 60], at ¶ 1; Train Video 4, [Docket No. 60], Exhibit 1 at 23:43:29–23:43:33). Defendant Steele, having safety concerns for himself and others on the train, in part due to being unaware if Plaintiff had any additional

weapons on his person, tased Plaintiff again in an effort to get Plaintiff to comply with his commands to place his hands behind his back. (Steele Aff., [Docket No. 60], at ¶ 1). As Plaintiff continued his actions of noncompliance, Defendant Steele tased Plaintiff a second time. (Train Video 4, [Docket No. 60], Exhibit 1 at 23:43:38–23:43:49). Defendant Steele continued to give verbal commands instructing Plaintiff to give the officers his hands. (Id.). During the struggle on the train floor, Defendant Martinez-Cruz attempted to gain control of Plaintiff by using his knee and hand to apply pressure to Plaintiff's upper back and neck. (Id.). Upon tasing Plaintiff a second time, the officers were able to secure one of Plaintiff's arms behind his back. (Steele Aff., [Docket No. 60-2], Exhibit 2, Steel Incident Report). Plaintiff continued to yell that he had not done anything, and Defendant Steele continued to give Plaintiff commands to place his arms behind his back and telling Plaintiff that he was going to tase him again. (Train Video 4, [Docket No. 60], Exhibit 1 at 23:43:49–23:44:25; Train Video 5, [Docket No. 60], Exhibit 1 at 23:43:49–23:44:25). Defendant Steele reported that Plaintiff still had not place his second arm behind his back, so Defendant Steele tased Plaintiff a third time on his leg. (Steele Aff., [Docket No. 60-2], Exhibit 2, Steel Incident Report; Train Video 4, [Docket No. 60], Exhibit 1 at 23:44:14–23:44:25). Upon Plaintiff being tased a third time, Defendants Steele and Martinez-Cruz were able to finish handcuffing Plaintiff. (Steele Aff., [Docket No. 60-2], Exhibit 2, Steel Incident Report). At his deposition, Plaintiff acknowledged that he did not voluntarily place his hands behind his back until after Defendant Steele had used the taser multiple times and after Defendant Martinez-Cruz had applied pressure to the back of Plaintiff's neck and his back. (Plf.'s Depo., [Docket No. 59-1], at 136:2–137:5).

After securing Plaintiff, Defendant Martinez-Cruz assisted Plaintiff to a seated position on the floor, and he instructed Plaintiff that once the train came to a stop, they were going to step

out the door. (Train Video 5, [Docket No. 60], Exhibit 1 at 23:44:25–23:45:34). It also appears that the officers searched Plaintiff's person while he was on the ground before he was raised to the seated position. (Id.). Plaintiff continued to struggle and talk loudly. (Id.). Plaintiff then told Defendant Martinez-Crux that he could not step out of the train because he could not move his legs, and Defendant Martinez-Cruz, from behind, lifted Plaintiff under the arms and pulled him off the train and onto the platform. (Train Video 5, [Docket No. 60], Exhibit 1 at 23:45:34–23:45:54). Plaintiff continued to yell while seated on the platform including yelling about his stuff on the floor of the train. (Id.). Defendant Martinez-Cruz hurried back onto the train and kicked the belongings on the floor of the train towards Plaintiff on the platform. (Id.).

After Plaintiff, in the seated position, was carried onto the train platform, Defendants Martinez-Cruz and Steele spoke with Plaintiff but do not make physical contact with Plaintiff. (Platform Video 2, [Docket No. 60], Exhibit 5 at 00:00–3:00).[7] Other officers then arrived on the scene. (Id.). The officers then assisted Plaintiff to his feet, and Defendant Martinez-Cruz took Plaintiff to Defendant Officer Brake's squad car which had by then arrived on scene.  (Id. at 3:00–3:35; Platform Video 3, [Docket No. 60], Exhibit 6 at 3:27–3:45; Platform Video 4, [Docket No. 60], Exhibit 7 at 3:40–4:16; Platform Video 1, [Docket No. 60], Exhibit 4 at 4:02–4:16). While Plaintiff was begin escorted to the squad car an officer can be seen carrying Plaintiff's hat with his belongings inside that hat. (Id.).

Once Plaintiff was pressed against the squad car, Defendant Martinez began frisking Plaintiff, but Plaintiff continued to struggle. (Platform Video 4, [Docket No. 60], Exhibit 7 at 4:16–4:37). On the squad car video provided, Plaintiff can be heard asking the officers if they were going to "beat him up" and "take his money." (Squad Car Video, [Docket No. 60], Exhibit

---

[7] Exhibits 4–7 are not time stamps. Therefore, the citations to those videos are only to the "running time" relative to each video and not the actual time of night.

1 at 23:50:08–23:50:47). Defendant Brake attempted to hold Plaintiff steady against the car while Defendant Martinez-Cruz completed frisking Plaintiff, but Plaintiff can be observed spontaneously beginning to hit his head against the car, and he continued to move his body in a manner which made frisking him problematic. (Platform Video 4, [Docket No. 60], Exhibit 7 at 4:20–4:37, Plf.'s Depo., [Docket No. 59-1], at 142:1–142:10). When Plaintiff began hitting his head on the car, Defendant Brake pulled Plaintiff away from the car. (Platform Video 4, [Docket No. 60], Exhibit 7 at 4:37–4:39). Defendant Brake told Plaintiff to "knock it off." (Squad Car Video, [Docket No. 60], Exhibit 1 at 23:50:47–23:50:51). Plaintiff, however, struck his own head on the car again. (Platform Video 4, [Docket No. 60], Exhibit 7 at 4:37–4:44). In an effort to gain control of Plaintiff, Defendant Brake performed a knee strike to the back of Plaintiff's leg, and he guided Plaintiff to the ground. (Platform Video 1, [Docket No. 60], Exhibit 4 at 4:45–4:48).

While it cannot be seen on the video, it is uncontested that upon reaching the ground, Plaintiff struck his chin resulting in a laceration that caused the paramedics to be called to the scene. (See, Plf.'s Depo., [Docket No. 59-1], at 143:8–143:13; Steele Aff., [Docket No. 60-2], Exhibit 2, Steel Incident Report). Plaintiff was later booked for obstructing the legal process with force, and he was also issued citations for disorderly conduct as well as fare evasion. (Steele Aff., [Docket No. 60-2], Exhibit 2, Steel Incident Report).

Plaintiff's citations for fare evasion and disorderly conduct were purportedly later dismissed by the prosecuting attorney. (See, Affidavit in Response to Defendants' Motion for Summary Judgment [Docket No. 79]).

## II.      DEFENDANTS' MOTION FOR SUMMARY JUDGMENT. [DOCKET NO. 56].

Defendants move this Court for an order granting summary judgment and dismissing Plaintiff's Complaint. (Defs.' Mot. for Summary Judgment [Docket No. 56]).

### A.  Standard of Review

Summary judgment is appropriate when the evidence demonstrates that there is no genuine issue of material fact such that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Smutka v. City of Hutchinson, 451 F.3d 522, 526 (8th Cir. 2006). A disputed fact is "material" if it might affect the outcome of the case, and a factual dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The moving party bears the burden of bringing forward sufficient admissible evidence to establish that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The evidence must be viewed in the light most favorable to the nonmoving party, and the nonmoving party must be given the benefit of all reasonable inferences to be drawn from the underlying facts in the record. Mirax Chem. Prods. Corp. v. First Interstate Commercial Corp., 950 F.2d 566, 569 (8th Cir. 1991). However, the "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007).

While the burden of demonstrating the absence of any genuine issue of material fact rests on the moving party, the nonmoving party may not rest on mere allegations or denials in their pleadings, but the non-moving party must set forth specific admissible evidence-based facts showing the existence of a genuine issue. Forrest v. Kraft Foods, Inc., 285 F.3d 688, 691 (8th

13

Cir. 2002). If the moving party satisfies its burden, Rule 56(e) requires the non-moving party to respond by submitting evidentiary materials that designate "specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); United of Omaha Life Ins. Co. v. Honea, 458 F.3d 788, 791 (8th Cir. 2006) (quoting Fed. R. Civ. P. 56(e)). "Naked assertions, unsubstantiated by the record," made in rebuttal do not amount to sufficient evidence to preclude summary judgment. Dutton v. University Healthcare Sys., L.L.C., 136 Fed. App'x 596 (5th Cir. 2005) (unpublished decision); see also, Simms v. McDowell, No. 4:08cv–60–M, 2009 WL 3160353, at *5 (W.D.Ky. Sept. 25, 2009) (holding that speculation that someone lied in an affidavit is "insufficient to defeat a motion for summary judgment."). "A properly supported motion for summary judgment is not defeated by self-serving affidavits." Frevert v. Ford Motor Co., 614 F.3d 466, 473 (8th Cir. 2010) (quoting Bacon v. Hennepin Cty. Med. Ctr., 550 F.3d 711, 716 (8th Cir. 2008)). "Rather, the plaintiff must substantiate allegations with sufficient probative evidence that would permit a finding in the plaintiff's favor." Id. at 473–74. A plaintiff may not merely point to unsupported self-serving allegations, but must substantiate allegations with sufficient probative evidence that would permit a finding in the plaintiff's favor. Wilson v. Int'l Bus. Mach. Corp., 62 F.3d 237, 241 (8th Cir. 1995); Smith v. International Paper Co., 523 F.3d 845, 848 (8th Cir. 2008).

The court is not bound to blindly adopt a non-moving party's version of the facts. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for the purpose of ruling on a motion for summary judgment." Scott, 550 U.S. at 380. "If the moving party supports the motion with evidence, the opposing party must rebut it or the court can consider the fact undisputed." Irish v. U.S. Dept. of Justice, Civ. No. 11-2703 (MJD/JJK), 2013

WL 451314, at *2 (D. Minn. Jan. 3, 2013) (citing Fed. R. Civ. P. 56(e)(2)), adopted by, 2013 WL 452576, rev'd on other grounds, 564 Fed. App'x 259 (8th Cir. 2014).

The movant is entitled to summary judgment where the nonmoving party has failed "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp., 477 U.S. at 322. No genuine issue of fact exists in such a case because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson, 477 U.S. at 252; Davidson & Associates v. Jung, 422 F.3d 630, 638 (8th Cir. 2005). "Mere allegations, unsupported by specific facts or evidence beyond the nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment." Thomas v. Corwin, 483 F.3d 516, 526–27 (8th Cir. 2007). If the nonmoving party relies on conclusory allegations, and fails to present evidence supporting a necessary element of a claim, then that claim cannot survive summary judgment. Beyer v. Firstar Bank, N.A., 447 F.3d 1106, 1108 (8th Cir. 2006).

"[P]ro se litigants are not excused from failing to comply with substantive and procedural law." Burgs v. Sissel, 745 F.2d 526, 528 (8th Cir. 1984). The claims of a plaintiff, even a *pro se* plaintiff, cannot survive a motion for summary judgment unless the plaintiff has set forth specific admissible facts demonstrating that there is a genuine issue for trial. See, Quam v. Minnehaha Cty. Jail, 821 F.2d 522, 522 (8th Cir. 1987).

### B.  Analysis

The Court evaluates Defendants' motion in light of the presently uncontested material facts contained in the affidavits and videos submitted by Defendants. See, Scott, 550 U.S. at 380; Irish, 2013 WL 451314, at *2.

### i.  Construction of Plaintiff's Complaint

The Court must first determine if Plaintiff's Complaint, [Docket No. 1], is due liberal construction as Plaintiff is presently proceeding pro se.

Plaintiff's operative Complaint, [Docket No. 1], was prepared, served, and filed with the assistance of Plaintiff's then counsel of record. Plaintiff's counsel filed Plaintiff's Complaint on June 2, 2015. [Docket No. 1]. On August 17, 2015, Plaintiff's counsel appeared at the Initial Pretrial Conference in the present case. (Minutes [Docket No. 18]).[8]

On February 5, 2016, Defendants filed a Motion to Compel, [Docket No. 24], to which Plaintiff responded through counsel of record on February 15, 2016. (Plf.'s Response [Docket No. 30]). On February 22, 2016, as Plaintiff was still represented by counsel, Plaintiff's counsel and Plaintiff appeared at the hearing on Defendants' motion to compel. (Minutes [Docket No. 31]). The Court granted Defendants' motion in part, (Order [Docket No. 32]), and it issued an Amended Scheduling Order. [Docket No. 34].

On April 28, 2016, after representing Plaintiff for nearly a year, Plaintiff's counsel moved to withdraw as Plaintiff's counsel of record without substitution. (Motion [Docket No. 44]). Defendants did not oppose the motion to withdraw. (Defs.' Mem. [Docket No. 48]). Plaintiff appeared personally at the motions hearing on Plaintiff's counsel's motion to withdraw, and he

---

[8] On November 23, 2015, Plaintiff's counsel filed a proposed amended complaint prepared by Plaintiff. (Letter, [Docket No. 21], Exhibit 1). The Court struck that filing without prejudice as filed in error with leave for Plaintiff to resubmit a motion for leave to amend the original Complaint in compliance with the Local Rules for the District of Minnesota. (Text Only Order [Docket No. 22]). Thereafter, Plaintiff's counsel made no further attempt to amend Plaintiff's Complaint.

did not oppose counsel's withdraw without substitution. (Minutes [Docket No. 50]). At that motions hearing, Plaintiff was cautioned more than once that his pro se status going forward in the present case would not relieve him from compliance with substantive and procedural law. (May 23, 2016, Motions Hearing, Digital Recording at 2:59–3:04 p.m.). On the record at that motions hearing, Plaintiff acknowledged his obligation to comply with substantive and procedural law, and he acknowledged that he understood that the prior Orders and schedules of this Court would remain in place and in effect. (Id.). As there was no opposition by any party to Plaintiff's counsel's motion to withdraw, the Court granted Plaintiff's counsel's Motion to Withdraw as Counsel of Record Without Substitution, [Docket No. 44], on May 23, 2016. (Minutes [Docket No. 50]).

After the Court permitted withdraw of Plaintiff's former legal counsel, Plaintiff also failed to bring any motion for leave to amend his Complaint. The nondispositive motions deadline in the Amended Scheduling Order passed without Plaintiff seeking leave to amend his Complaint.

As Plaintiff's Complaint was prepared, filed, and served with the assistance of legal counsel, it was not filed pro se, and therefore, it shall not be afforded the liberal construction otherwise given to pro se drafted pleadings.

### ii.  Plaintiff's Claims for Monetary and Punitive Damages

Plaintiff seeks compensatory and punitive damages from Defendants. (Compl. [Docket No. 1]). In their Memorandum in Support of their Motion for Summary Judgment, Defendants claim that Plaintiff has not sued any of the named Defendants in their individual capacities, and therefore, Plaintiff's claims fail as a matter of law.

The Eighth Circuit "require[s] more than ambiguous pleading" to state an individual-capacity § 1983 claim. See, Baker v. Chisom, 501 F.3d 920, 924 (2007). Rather, a "'clear statement' or a 'specific pleading' indicating that the plaintiff [is] suing the defendants in their individual capacities" is required. Remington v. Hoopes, 611 Fed. App'x 883, 885 (8th Cir. 2015). The Complaint now at issue contains no such clear and specific statements in the body of the document.

Although the Complaint lacks an express statement as to asserting individual capacity claims, the Complaint does in other ways suggest that Plaintiff may have intended to sue Defendants in their individual capacities. For example, in his Prayer for Relief, Plaintiff seeks to recover punitive damages, which could only be sought if Defendants were sued in their individual capacity. See in contrast, City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 271 (1982) (holding "that a municipality is immune from punitive damages under 42 U.S.C. § 1983"). However, the Eighth Circuit has held that even such cursory allusions to possible individual claims affords no basis for overlooking Plaintiff's failure to specifically assert his Section 1983 claims against Defendants in their individual capacity in the body of the Complaint. The Eighth Circuit has emphasized that its requirement of express pleading of individual capacity claims is strict, in contrast with the "more lenient" and flexible Section 1983 pleading rules that prevail in other circuits. Murphy v. State of Ark., 127 F.3d 750, 755 (8th Cir. 1997); see also, Baker, 501 F.3d at 924 n. 2 (explaining that the "flexible approach" to pleading individual capacity claims urged on the panel by the plaintiff is foreclosed by circuit precedent, and therefore, it may only be adopted by the court sitting en banc).

Consistent with its strict approach to pleading, which the undersigned must apply, the Eighth Circuit has found that a complaint did not state an individual capacity claim under

Section 1983 even where its "substantive paragraphs included a reference to [the Defendants] as 'individual Defendants' and [the Plaintiff] prayed for 'exemplary [punitive] damages' that may not be recovered in an official capacity suit." Id. at 924. The Eighth Circuit has also determined that a "district court erred in excusing [the Plaintiff's] failure to clearly assert personal [individual] capacity claims in his initial complaint" based on a conclusion that the defendant otherwise had adequate notice that the plaintiff intended the claims to encompass individual capacity claims. Murphy, 127 F.3d at 754–55.

Therefore, this Court must conclude that Plaintiff has brought claims against Defendants in only their official capacities.

Official-capacity claims "generally represent only another way of pleading an action against the entity of which an officer is an agent," and "[s]uits against state officials in their official capacity therefore should be treated as suits against the State." Hafer v. Melo, 502 U.S. 21, 25 (1991) (citations and quotations omitted). Defendant the Metropolitan Council "is a political subdivision of the State of Minnesota that, among other things, oversees public transportation in Minneapolis and St. Paul." Heisler v. Metropolitan Council, 339 F.3d 622, 624–25 (8th Cir. 2003). The named Defendants are each alleged to be an employee of the Metropolitan Transit Police, a unit within Defendant Metropolitan Council. (Compl., [Docket No. 1], at ¶ 6).

"[N]either a State nor its officials acting in their official capacities are 'persons' under § 1983," and thus monetary relief is not available under § 1983 from Defendants in their official capacity. See, Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989); see also, Karsjens v. Jesson, 6 F. Supp. 3d 916, 941 (D. Minn. 2014).

In addition, the government and its officials are immune from punitive damages under §
1983 because "considerations of history and policy do not support exposing a municipality to
punitive damages for the bad-faith actions of its officials." See, City of Newport v. Fact
Concerts, Inc., 453 U.S. 247, 271 (1981).

Plaintiff will not be able to recover monetary relief or punitive damages from any of the
Defendants in their official capacities; therefore, the Court recommends that all these aspects of
Plaintiff's § 1983 claim be dismissed with prejudice.

### iii.   Injunctive and Declaratory Relief

In contrast to claims for monetary damages, "suits may be brought in federal court
against state officials in their official capacities for prospective injunctive relief to prevent future
violations of federal law." Fond du Lac Band of Chippewa Indians v. Carlson, 68 F.3d 253, 255
(8th Cir. 1995) (citing Ex Parte Young, 209 U.S. 123 (1908)). In his Complaint, Plaintiff asks the
Court for declaratory judgment regarding Defendants' violations of the law and an injunction
prohibiting "further illegal conduct against Plaintiff." (Compl, [Docket No. 1], at 9).

However, as the Eighth Circuit has explained:

> to seek injunctive relief, a plaintiff must show that he is under threat of suffering
> "injury in fact" that is concrete and particularized; the threat must be actual and
> imminent, not conjectural or hypothetical; it must be fairly traceable to the
> challenged action of the defendant; and it must be likely that a favorable judicial
> decision will prevent or redress the injury.

Bernbeck v. Gale, 829 F.3d 643, 646 (8th Cir. 2016) (quoting Summers v. Earth Island Inst., 555
U.S. 488, 493 (2009)). "In the case of complaints for injunctive relief, the 'injury in fact' element
of standing requires a showing that the plaintiff faces a threat of ongoing or future harm." Park v.
Forest Serv. of the United States, 205 F.3d 1034, 1037 (2000). "Similarly, in seeking declaratory
relief, 'a plaintiff must be seeking more than a retrospective opinion that he was wrongly harmed

by the defendant." <u>Smith v. Roy</u>, No. 10-cv-2193 (JRT/TNL), 2012 WL 1004985, at *5 (D.

Minn. Jan. 25, 2012), <u>report and recommendation adopted by</u> <u>Smith v. Fabian</u>, No. 10-cv-2193

(JRT/TNL), 2012 WL 1004982, at *1 (D. Minn. Mar. 26, 2012) (citations omitted). "In other

words, the plaintiff must demonstrate 'a real and immediate threat that [he] would again suffer

similar injury in the future.'" <u>Id.</u> at *6 (citation omitted).

Plaintiff's Complaint does not allege that there is any real threat that Plaintiff will

encounter any of the Defendants again under the same circumstances as alleged in his

Complaint. Plaintiff himself avers that he lived in Atlanta, Georgia and was not a resident of

Minnesota, (Compl., [Docket No. 1], at ¶ 5); instead, Plaintiff alleges that he was "in Minnesota

to take care of legal affairs[.]" (<u>Id.</u> at ¶ 9). Since the filing of his Complaint, Plaintiff has changed

his address of record to a residence in Ohio. Plaintiff's Complaint involves a single incident, and

Plaintiff alleges no additional incidents subsequently. Moreover, he does not claim any policy or

practice of Defendant Metropolitan Council that would lead to the alleged harm recurring and

involving him. Although Plaintiff may remain apprehensive that the incident as he perceived it

could possible or in some way conceivably happen again, the United States Supreme Court has

explained:

> The reasonableness of [his] fear is dependent upon the likelihood of a recurrence of the allegedly unlawful conduct. It is the *reality* of the threat of repeated injury that is relevant to the standing inquiry, not the plaintiff's subjective apprehensions. The emotional consequences of a prior act are not a sufficient basis for an injunction absent a real and immediate threat of future injury by the defendant.

<u>City of Los Angeles v. Lyons</u>, 461 U.S. 95, 107 n.8 (1983). The operative Complaint, on its face,

does not allege any plausible claim that there is a real and immediate threat that the incident

described in Plaintiff's Complaint will occur in the future.

Therefore, the Court finds that Plaintiff lacks standing to seek either injunctive or declaratory relief on these claims. Accordingly, the Court recommends that all these aspects of Plaintiff's § 1983 claim be dismissed with prejudice as well.

### iv. Qualified Immunity[9]

Qualified immunity shields government officials from liability unless their conduct "violated a clearly established constitutional or statuary right of which a reasonable official would have known." Carpenter v. Gage, 686 F.3d 644, 648 (8th Cir. 2012). Thus, the qualified immunity analysis is divided into two prongs: (1) whether the facts alleged establish a violation of a constitutional or statutory right; and (2) whether that right was clearly established at the time of the alleged violation, such that a reasonable official would have known that his actions were unlawful. Kail v. Triveline, 661 F.3d 981, 985 (8th Cir. 2011). "If the answer to either question is no, then the [officials] are entitled to qualified immunity." Id. The Court may exercises its "sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first." Mead v. Palmer, 794 F.3d 932, 936 (8th Cir. 2015) (quotation omitted).

1. Plaintiff's Arrest

Plaintiff first alleges that his arrest was not supported by probable cause, and therefore his arrest was unlawful. "It is well established that a warrantless arrest without probable cause violates an individual's constitutional rights under the Fourth and Fourteenth Amendments." Walker v. City of Pine Bluff, 414 F.3d 989, 992 (8th Cir. 2005) (quotation omitted). An officer has probable cause "when the totality of the circumstances at the time of the arrest are sufficient to lead a reasonable person to believe that the defendant has committed or is committing an

---

[9] Because Plaintiff cannot seek monetary or punitive damages from any of the Defendants, and because he lacks standing to seek injunctive or declaratory relief on the violation on which he bases his federal claims, the analysis in sections III.B.ii and iii completely disposes of Plaintiff's Complaint, [Docket No. 1], in its entirety. However, the Court will, in an abundance of caution, conduct an analysis to determine whether Defendants' are also entitled to qualified immunity.

offense." Ulrich v. Pope Cty., 715 F.3d 1054, 1059 (8th Cir. 2013). However, "the issue for immunity purposes is not probable cause in fact but *arguable probable cause*, that is, whether the officer should have known that the arrest violated plaintiff's clearly established right." Habiger v. City of Fargo, 80 F.3d 289, 295 (8th Cir. 1996) (emphasis added) (citation and quotation omitted). "Arguable probable cause exists even where an officer mistakenly arrests a suspect believing it is based in probable cause if the mistake is objectively reasonable." Ulrich, 715 F.3d at 1059. While the probable cause standard gives law enforcement "room for reasonable mistake," the qualified immunity standard "affords law enforcement officials an even wider berth for mistaken judgments 'by protecting all but the plainly incompetent or those who knowingly violate the law.'" Id. (quoting Hunter v. Bryant, 502 U.S. 224, 229 (1991)).

"The first step in the arguable probable cause analysis is to examine the criminal statues pursuant to which [Plaintiff] was arrested." Gilmore v. City of Minneapolis, 13-cv-1019 (JRT/FLN), 2015 WL 1189832, at *10 (D. Minn. Mar. 16, 2015), modified sub nom. Gilmore v. Duboc, 13-cv-1019 (JRT/FLN), 2015 WL 3645846 (D. Minn. June 10, 2015), aff'd sub nom. Gilmore v. City of Minneapolis, 837 F.3d 827 (8th Cir. 2016). In the present case, Plaintiff was issued citations for alleged violation of the Minnesota fare evasion statute and the Minnesota's disorderly conduct statute. Defendants also attest that Plaintiff was later booked at the Ramsey County Jail for obstructing the legal process with force. Plaintiff's booking sheet, however, was not provided and the incident reports submitted indicate that that charge was later amended to terroristic threats and forwarded to the Saint Paul City Attorney's office as the "case was declined" by the County Attorney's Office. (Steele Aff., [Docket No. 60-7], Supplemental Incident Report at 9–10). Defendant Steele's affidavit provides limited insight regarding the offense for which Plaintiff was arrested as it provides only that Defendant Steele placed

"Plaintiff under arrest after he was observed yelling 'I'll kill you right here' to another passenger, had an open box cutter in his possession, and resisted [Defendant Steele's] commands." (Steele Aff., [Docket No. 60], at ¶ 1).

The Court, however, need not determine exactly what crime Plaintiff was charged for, or what crime under which the officers originally placed Plaintiff under arrest. Defendant Steele only needed arguable probable cause that **some** crime was committed, not necessarily each or any of the crimes charged. Gilmore, 2015 WL 1189832, at *10 (citing Shqeirat v. U.S. Airways Group, Inc., 645 F. Supp. 2d 765, 785 (D. Minn. 2009) (noting that there must be probable cause that "**a** crime was being or had been committed") (emphasis added); see also, Devenpeck v. Alford, 543 U.S. 146, 153–54 (2004) (rejecting the rule "that the offense establishing probable cause must be closely related to, and based on the same conduct as, the offense identified by the arresting officer at the time of the arrest") (internal quotation marks omitted)).

The Minnesota disorderly conduct statute provides that:

> Whoever does any of the following in a public or private place . . . knowing, or having reasonable grounds to know it will, or will tend to, alarm, anger or disturb others or provoke an assault or breach of the peace, is guilty of disorderly conduct, which is a misdemeanor:
>
> (1) engages in brawling or fighting; or
> (2) disturbs an assembly or meeting, not unlawful in its character; or
> (3) engages in offensive, obscene, abusive, boisterous, or noisy conduct or in offensive, obscene, or abusive language tending reasonably to arouse alarm, anger, or resentment in others.

Minn. Stat. § 609.72, subd. 1.

The state fare evasion statute provides that "[a] person is guilty of a misdemeanor" when said person "intentionally obtains . . . service for himself . . . from a provider of public transit or from a public conveyance" by occupying or riding "in any public transit vehicle without paying

the applicable fare or otherwise obtaining the consent of the transit provider . . . ." Minn. Stat. §
609.855, subd. 1.

Defendant Steele had arguable probable cause to arrest Plaintiff for disorderly conduct
under the disorderly conduct statute, which, among other things, bars a person from engaging in
"offensive, obscene, abusive, boisterous, or noisy conduct or in offensive, obscene or abusive
language tending reasonably to arouse alarm, anger, or resentment in others," when the person
knows that such conduct or language "will tend to[] alarm, anger or disturb others or provoke an
assault or breach of the peace." Minn. Stat. § 609.72, subd. 1 (emphasis added).[10] Defendant
Steele personally observed Plaintiff yell "Shut up. Shut up. Shut up. I will kill you right here.
Shut up" (emphasis added) at another unidentified passenger on the train while Plaintiff gestured
with his arms in the direction of the passenger he was threatening. Plaintiff's threat, the manner
in which he delivered the threat, and the disturbance it caused the other passengers created
arguable probable cause for Defendant Steele to arrest Plaintiff for disorderly conduct. See, In re
Welfare of T.L.S., 713 N.W.2d 877, 880–81 (Minn. Ct. App. 2006) (concluding that officers had
probable cause to arrest student for disorderly conduct because her loud shrieking of profanities
in school arguably amounted to boisterous or noisy conduct).[11]

---

[10] In making this determination, the court necessarily interprets state criminal statutes. In doing so, the Court looks
to Minnesota law and is "bound by the decision of the Minnesota Supreme Court." Baribeau v. City of Minneapolis,
596 F.3d 465, 475 (8th Cir. 2010).

[11] To the extent the officers relied solely on Plaintiff's verbal statements in developing probable cause, Minnesota
law is clear that the disorderly conduct statute, as applied to speech, proscribes only "'fighting words'–words 'which
by their very utterance inflict injury or tend to incite an immediate breach of the peace.'" Baribeau v. City of
Minneapolis, 596 F.3d 465, 475 (8th Cir. 2010) (citing In the Matter of the Welfare of S.L.J., 263 N.W.2d. 412, 419
(Minn. 1978)). The threat of death would appear to rise to the level of fighting words which by their utterance would
"tend to incite an immediate breach of the peace." See generally, State v. Nelson, No. A14-356, 2014 WL 7237043,
at *3 (Minn. Ct. App. Dec. 22, 2014) (finding that loudly calling a store clerk a "f–king a–hole" and a "piece of sh–
t" or "worthless piece of sh–t" in the presence of customers constituted fighting words because the language was
"inherently likely to provoke violent reaction" from the clerk) (alterations in original).

The Court, however, need not determine whether the threat of death in this case definitively constituted "fighting
words." The threat did not clearly fall outside the category of "fighting words," and the Court is only applying the

The present case provides a level of arguable probable cause at least equal to if not greater than another recent case that concluded that police officers were entitled to qualified immunity when faced with an unlawful arrest claim. Moreover, Plaintiff's argument that the officers must have lacked probable cause at the time of his arrest because the charges were later dismissed is without merit. In this regard, the Court finds instructive Gilmore v. City of Minneapolis, 837 F.3d 827 (8th Cir. 2016). Gilmore involved a plaintiff who in a Section 1983 action claimed that he was unlawfully arrested by officers based on the reported secondhand statements of witnesses regarding events the officers did not witness. Id. The plaintiff in Gilmore argued that "there was insufficient evidence to charge him with any offense, in part because he was processed for immediate release and videos portraying the incident came to light after the fact and supported his version of the events." Id. at 833. The Eighth Circuit, however, held that the evidence developed after the arrest was irrelevant to the question of arguable probable cause. The court reasoned that "probable cause is determined at the [time and] moment the arrest was made, [and] any later developed facts are irrelevant to the probable cause analysis for an arrest." Id. at 833–34 (internal quotations omitted) (citation omitted).

In the present case, any argument Plaintiff asserts regarding facts developed after his arrest are likewise irrelevant to the present determination of whether Defendant Steele had arguable probable cause at the time he arrested Plaintiff. For the reasons stated above, when Defendant Steele initially detained Plaintiff, Defendant Steele had arguable probable cause to arrest Plaintiff.

---

deferential arguable probable cause standard. Ultimately, the threat combined with Plaintiff's body movements and the disturbance caused to the rest of the passengers was enough to show that the officers were objectively reasonable in believing they had probable cause, even if, in hindsight, they may actually not have.

Because the Court finds that Defendant Steele had arguable probable cause to arrest Plaintiff, Defendants are entitled to qualified immunity with respect to Plaintiff's claim for unlawful arrest.

2. Search of Plaintiff's Person

Plaintiff next alleges that Defendants deprived him of his Fourth Amendment right to be free from unreasonable search. (Compl. [Docket No. 1]). While Plaintiff does not specify which search he is referring to, it appears Plaintiff is likely referring to the initial search of his person which occurred on the train floor immediately following Plaintiff being placed in handcuffs. (See, Id.).

"Under the Fourth Amendment, a warrantless search of the person is reasonable only if it falls within a recognized exception to the warrant requirement." United States v. Chartier, 772 F.3d 539, 545 (8th Cir. 2014) (quotation omitted). One of these exceptions allows an officer to conduct a "search incident to a lawful arrest." Arizona v. Gant, 556 U.S. 332, 338 (2009). "Such a search may include a search of the arrestee's person to remove weapons and seize evidence to prevent its concealment or destruction." Chartier, 772 F.3d at 545. "It is the fact of arrest that enables the officer to conduct a search, not a particularized suspicion as to the suspect's dangerousness." United States v. Pratt, 355 F.3d 1119, 1122 (8th Cir. 2004). Thus, when officers have "at least arguable probable cause" to perform an arrest, they cannot be held liable for performing a search incident to that arrest. Meehan v. Thompson, 763 F.3d 936, 946 (8th Cir. 2014) (citing United States v. Robinson, 414 U.S. 218, 235 (1974)).

Because this Court has already determined that Defendant Steele had arguable probable cause to arrest Plaintiff, Defendants are entitled to qualified immunity on Plaintiff's claim that Defendants deprived him of his Fourth Amendment right to be free from unreasonable searches.

3. Amount of Forced Used

Lastly, Plaintiff alleges that Defendants deprived him of "his right to be free from excessive force." (Compl., [Docket No. 1], at ¶ 33). While Plaintiff again does not specifically articulate which show of force he asserts was excessive, he makes allegations about being tased multiple times, the officers placing their knees on Plaintiff's back and neck in their attempt to handcuff Plaintiff, being thrown onto the train platform, being hit in the head by several officers while sitting on the train platform, and suffering a cut to his chin when he was taken to the ground with a knee strike. (Compl., [Docket No. 1], at ¶¶ 2, 22, 23, 23a).[12]

"The right to be free from excessive force is a clearly established right under the Fourth Amendment's prohibition against unreasonable seizures of the person." Cook v. City of Bella Villa, 582 F. 3d 840, 849 (8th Cir. 2009) (quoting Moore v. Indehar, 514 F.3d 756, 759 (8th Cir. 2008)). "An officer's use of force violates the Fourth Amendment if it is objectively unreasonable in light of the facts and circumstances of the particular case, as 'judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" Hollingsworth v. City of St. Ann, 800 F.3d 985, 989 (8th Cir. 2015) (quoting Graham v. Connor, 490 U.S. 386, 396 (1989)). Whether an officer's use of force is "excessive" is a question of whether the force used was "objectively reasonable under the particular circumstances." Id. "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interest against the countervailing government interest at stake."

---

[12] To the extent Plaintiff argues that his right to be free from excessive force was violated when Defendants allegedly threw him onto the train platform and hit him in the head several times while he was a seated on the train platform, those arguments clearly lack merit. The uncontested material facts in the record, including the videos described above, show that Plaintiff was not thrown onto the train platform and that no officer struck Plaintiff in the head. The Court is not bound to blindly adopt a non-moving party's mere allegations in his complaint as to his version of the facts. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for the purpose of ruling on a motion for summary judgment." Scott, 550 U.S. at 380.

Graham v. Connor, 490 U.S. 386, 396 (1989) (quoting Tennessee v. Garner, 471 U.S. 1, 8 (1985)). Therefore, the Court "evaluate[s] the totality of the circumstances, including the severity of the crime, the danger the suspect poses to the officer or others, and whether the suspect is actively resisting arrest or attempting to flee." Cook, 582 F.3d at 849.

"'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers violates the Fourth Amendment." Graham, 490 U.S. at 396 (internal citation omitted). When an arrestee flees or resists, some use of force by the police is reasonable. Foster v. Metropolitan Airports Comm'n, 914 F.2d 1076, 1082 (8th Cir. 1990).

As noted above, in § 1983 actions, qualified immunity shields government officials from suit unless their conduct violated a clearly established right of which a reasonable official would have known. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987). For a plaintiff to overcome qualified immunity, existing precedent must have placed the constitutional question "beyond debate." City & Cnty. of San Francisco Calif. v. Sheehan, 135 S.Ct. 1765, 1774 (2015).

The undisputed video evidence shows that when Defendant Steele tased Plaintiff, Plaintiff had been refusing to comply with several verbal commands, was continuing to refuse to comply with Defendants' verbal commands, and was resisting the officers' attempts to handcuff Plaintiff. Defendant Steele also gave Plaintiff several warnings that if Plaintiff did not comply with Defendant Steele's commands, Plaintiff was going to be tased. As such, Defendant Steele's use of the taser while Plaintiff was resisting arrest and defying officer commands was objectively reasonable under the circumstances in which it was used. See, Kaleta v. Johnson, No. 12-cv-170 (JNE/FLN), 2013 WL 3448148, at *10 (D. Minn. July 9, 2013) (concluding "that the officers'

use of their Tasers in order to subdue [plaintiff] and control the situation, after warning [plaintiff] that he would be Tased if he did not comply, and after [plaintiff] actively resisted their less forceful attempt to handcuff him, was not objectively unreasonable"); see also, Hinton v. City of Elwood, Kansas, 997 F.2d 774, 781 (10th Cir. 1993) (providing that the officer's actions did not constitute excessive force when the use of a stun gun ceased once the individual who was resisting arrest was successfully handcuffed). Moreover, even the use of multiple tasings has been found objectively reasonable when a person continues to resists officer commands. See, Hinton, 997 F.2d at 781 (finding the use of a taser two times objectively reasonable under the circumstances of plaintiff resisting officer commands).

Even if Defendant Steele's tasing of Plaintiff constituted excessive force, Plaintiff's right to be free from the use of taser under the circumstances at issue here was not clearly established at the time of the incident: July 3, 2014. Later in July 2014, the Eighth Circuit itself noted that it then had "yet to determine whether a violent subject, acting aggressively towards officers, has a clearly established right to be free from multiple tasings." De Boise v. Taser Intern., Inc., 760 F.3d 892 (8th Cir. 2014). [13]

Accordingly, in the present case, Plaintiff's right to be free from multiple tasings while resisting arrest, even if assumed only for the sake of argument that it constituted excessive force, was not a clearly established right at the time of the July 3, 2014, incident now at issue. Therefore, Defendants are entitled to qualified immunity regarding Plaintiff's claims that

---

[13] De Boise involved a mentally ill naked male who received ten taser shock cycles due to his noncompliance with officer commands and the officers' belief that he posed a threat to the officers. Id. at 895. The De Boise court concluded that even if the officers' repeated tasing of plaintiff amounted to excessive force in violation of plaintiff's Fourth Amendment rights, such rights were not clearly established at the time of the incident reasoning that "the state of the law would not have placed 'an officer on notice that he must limit the use of his taser in certain circumstances, even though the subject continued to struggle and resist.'" Id. at 897–98 (citations omitted).

Defendants violated his Fourth Amendment right to be free from excessive force when Defendant Steele tased Plaintiff.

Plaintiff also alleges that Defendants used excessive force in subduing him when the officers placed their knees on Plaintiff's neck and back while Plaintiff was on the train floor and when Defendant Brake took Plaintiff to the ground near his squad car. As noted above, the undisputed video evidence shows that while Plaintiff was on the train floor he was refusing to comply with the officers' commands, and the officers were unable to handcuff Plaintiff until after he had both been tased and Defendant Martinez-Cruz applied pressure to Plaintiff's neck and back. When Defendant Brake later took Plaintiff to the ground, he was attempting to frisk Plaintiff, but Plaintiff was struggling and spontaneously hitting his own head on the patrol car.

Based on these undisputed circumstances, the Court finds no authority which would place the issue of the lawfulness of the Defendant Martinez-Cruz's or Defendant Brake's conduct beyond the pale. See, e.g., Wertish v. Krueger, 433 F.3d 1062, 1066–68 (8th Cir. 2006) (rejecting an excessive force claim where an officer threw plaintiff to the ground, pinned him down, and placed his weight onto the plaintiff's back before handcuffing him, even though the plaintiff was only passively resistant). Further, there is no robust consensus of persuasive authority that would put Defendants on notice that their actions of pinning Plaintiff to the ground in an effort to handcuff him or taking Plaintiff to the ground when he resist being frisked were unlawful. See, e.g., Id.; Heitzman v. Engelstad, No. 12-cv-2274 (MJD/LIB), 2015 WL 506279, at *6 (D. Minn. Feb. 6, 2015) (finding that defendant was entitled to qualified immunity where he spun plaintiff—who was walking away in noncompliance with the officer's commands— around several time, slammed her against a car hood, and forcefully pushed on plaintiff's neck and back with his arm to hold her down to handcuff her wrist behind her back").

The fact that Plaintiff suffered a laceration on his chin when Defendant Brake transitioned Plaintiff to the ground after Plaintiff resisted being frisked offers no further significant, material insight into the qualified immunity analysis in the present case. As the Eighth Circuit has held, "[t]he governing rule should not turn on such unpredictable and fortuitous consequences of an officer's use of force." Chambers v. Pennycook, 641 F.3d 898, 906 (8th Cir. 2011) (citing Lee v. Ferraro, 284 F.3d 1188, 1200 (11th Cir. 2002)). "The rule should focus instead on whether the force applied is reasonable from the perspective of a reasonable officer on the scene at the time the force is used." Id. (citing Graham, 490 U.S. at 396). As noted above, courts have rejected excessive forces claims similar to the claim in the present case where officers have thrown arrestees to the ground in an effort to gain control of the person, even in cases where the person was only "passively resisting." See, e.g., Wertish, 433 F.3d at 1066–68 (rejecting an excessive force claim where an officer threw plaintiff to the ground, pinned him down, and placed his weight into the plaintiff's back before handcuffing him, even though the plaintiff was only passively resistant).

Accordingly, in the present case, Plaintiff's right to be free from physical pressure being applied to his back and neck while resisting arrest and his right to be free from being taken to the ground when he resisted being frisked—even if it is assumed for the sake of argument only that those actions constituted excessive force—were not a clearly established right at the time of the incident now at issue. Therefore, Defendants are entitled to qualified immunity regarding Plaintiff's claims that Defendants violated his Fourth Amendment right to be free from excessive force.

Accordingly, the Court recommends that Defendants' Motion for Summary Judgment, [Docket No. 56], be **GRANTED**, and Plaintiff's Complaint be dismissed with prejudice.

### III.    Plaintiff's Other Filings

Defendant's filed the present motion for summary judgment on September 2, 2016. (Defs.' Mot. [Docket No. 56]). On September 7, 2016, a briefing schedule was established regarding Defendants' present motion.  (Order [Docket No. 63]). That briefing schedule ordered Plaintiff to respond to Defendants' motion by no later than September 23, 2016. (Id.). Plaintiff failed to timely submit any materials in response to Defendant's motion for summary judgment before the expiration of his ordered time to file a response. Plaintiff, however, did file a number of documents seemingly unrelated to the arguments raised in Defendants' motion for summary judgment. (See, [Docket No. 62, 64–67).[14] While these documents were field before Plaintiff's deadline to file a response to Defendants' motion for summary judgment, the content of those documents does not address Defendants' dispositive motion, and even construed liberally, those documents do not create any genuine dispute of material fact which would preclude the Court's recommendation to grant the Defendants' dispositive motion. (See, Id.).

After his deadline to respond to Defendants summary judgment motion, but prior to the October 17, 2016, hearing on Defendants' motion for summary judgment, Plaintiff submitted only very limited materials ostensibly in opposition to the motion for summary judgment. (See, [Docket No. 69, 70–84). In that time frame, however, six of the documents filed by Plaintiff relate solely to discovery in the present case although the time for discovery in the present case had closed on September 15, 2016. (See, [Docket Nos. 70–74, 77, 82]).[15] Some of the documents

---

[14] Plaintiff's "Affidavit of Fact for Remedy for Remedy for Cure and Maintenance," [Docket No. 62], addresses Plaintiff's capacity as a person. Plaintiff's Affidavits of Fact, [Docket No. 64 and 65], outline Plaintiff's Complaint with what appears to be a calculation of Plaintiff's purported damages. Plaintiff's "Affidavit of Fact for Remedy for Cure and Maintenance," [Docket No. 66], and his "Affidavit of Fact for Remedy for Cure and Maintenance," [Docket No. 67], are further calculations of Plaintiff's purported damages.

[15] A noted above, the document Plaintiff filed at Docket No. 70 is actual entitled "Defendant's Motion for Discovery and Inspection of Evidence;" however, it is actually Plaintiff's motion. The motion seeks discovery in a criminal case under certain Texas state statutes. (See, [Docket No. 70]). Putting aside the untimeliness of the motion, this is

filed by Plaintiff once again addressed his earlier desire to terminate his counsel of record; an issue which was previously resolved when Plaintiff's counsel of record was allowed to withdraw without substitution. (See, [Docket No. 78, 81, 84]). Plaintiff filed one document, with an accompanying affidavit, before the October 17, 2016, hearing on Defendants' motion for summary judgment, which purported to address Defendants' dispositive motion. (See, Affidavit in Response to Defendants' Motion for Summary Judgment [Docket No. 79]; Affidavit of Truth [Docket No. 80]). As discussed above, however, the content of that document is largely irrelevant and non-responsive to Defendants' motion for summary judgment. (See, Id.). Even if the Court were to consider these untimely documents, none of the documents creates any genuine dispute of material fact which would alter this Court's analysis or recommendation to grant Defendants' motion for summary judgment. (See, [Docket No. 69, 70–84).

On October 17, 2016, the day of the hearing on Defendants' motion for summary judgment, Plaintiff filed three documents ostensibly related to Defendant's motion for summary judgment. (See, [Docket No. 86–88]). These documents are clearly untimely as they were submitted on the day of the motions hearing almost a month after Plaintiff's Court ordered deadline to file his response in opposition to the motion. Even if the Court were to accept those late filed materials, which it does not, the materials do not create any genuine dispute of material fact and the materials are largely irrelevant to the facts of the present case. (See, [Docket No. 86–88]).

---

not a criminal case. As this is not a criminal case and the discovery sought in the motion is irrelevant to the present case, Plaintiff's motion, [Docket No. 70], is **DENIED**. Plaintiff's Request for Production of Documents, [Docket No. 71]; his Letter Request for Production of Documents, [Docket No. 72]; his second Letter Request for Production of Documents, [Docket No. 73]; and his document entitled Defendants' Answers to Plaintiff's Request for Admissions, [Docket No. 74], each purports to seek discovery directly from Defendants, however, the time period for discovery had ended at the time Plaintiff filed these documents. As such, the documents are untimely.

Plaintiff has also regularly continued to file materials since the motions hearing date of October 17, 2016. (See, [Docket No. 90–91, 92–93, 95–98). All of these late filed materials, if intended to oppose Defendant's motion, are patently untimely.  The content of each of these extremely late filed documents is effectively immaterial to the present motion, and in any event the Court will not accept or consider these late documents.

On November 7, 2016, Plaintiff unilaterally filed an Amended Complaint. [Docket No. 96]. That purported Amended Complaint is clearly untimely as the deadline to amend the pleadings expired on November 15, 2015. (See, Amended Scheduling Order, [Docket No. 34], at ¶ II). Plaintiff's purported Amended Complaint was not accompanied by any motion or memorandum of law, it wholly fails to even attempt to comply with Local Rule 7.1, and even if the Court where to construe it as a motion to amend the Complaint, the affidavit Plaintiff filed contemporaneously with the Amended Complaint does not identify any extraordinary circumstances which would permit the Court to consider the motion to amend while Defendants' motion for summary judgment is under advisement. (See, Plf.'s Aff. [Docket No. 97]). Moreover, allowing Plaintiff to amend his Complaint at this time, after the time for discovery has closed and while Defendants' motion for summary judgment is under advisement with this Court, would cause delay as well as prejudice to Defendants, and it could require additional discovery. Under similar circumstances, the Eighth Circuit Court of Appeals has held that a District Court did not abuse its discretion in denying leave to amend a complaint where a motion to amend was filed after defendants' summary judgment motion. See, Proctor v. Toney, 53 Fed. App'x 793, 795 (8th Cir. 2005); see also, Bediako v. Stein Mart, Inc., 354 F.3d 835, 840–41 (8th Cir. 2004) (holding that District Court did not abuse its discretion by denying plaintiff's request to amend complaint based on the facts that the new theory of recovery was not raised in the

35

plaintiff's previous complaints, defendant was not placed on notice of the proposed claims, discovery had closed, and defendant had moved for summary judgment); <u>Bell v. Allstate Life Ins. Co.</u>, 160 F.3d 452 (8th Cir. 1998) (upholding District Court's decision to deny plaintiff's motion to amend based on undue delay, prejudice to the defendants in having to reopen discovery so near the trial date, and because the only reason for the untimeliness of the motion was plaintiff's lack of due diligence). In the present case, Plaintiff has filed only a purported Amended Complaint without any accompanying motion or memorandum of law explaining his untimeliness.

Therefore, Plaintiff's Amended Complaint, [Docket No. 96], is **STRICKEN as filed in error**.

Plaintiff also submitted a second application to proceed without prepaying fees or cost seeking to proceed *in forma pauperis* ("IFP") under 28 U.S.C. § 1915. [Docket No. 98]. It is unclear why Plaintiff submitted this second application as he has already been granted leave to proceed IFP pursuant to his first application. (<u>See</u>, Order [Docket No. 8]). As Plaintiff has already been granted leave to proceed IFP, Plaintiff's second application to proceed without prepaying fees, [Docket No. 98], is **DENIED** as moot.

## IV.   CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that**:**

1. Plaintiff's Motion for Discovery and Inspection of Evidence, [Docket No. 70], is **DENIED**;

2. Plaintiff's other documents seeking discover directly from Defendants, [Docket Nos. 71–74], are **STRICKEN as untimely filed**;

36

3. Plaintiff's Affidavit of Fact, [Docket No. 77], and Form 19 Request, [Docket No. 82], are **STRICKEN as untimely filed**;

4. Plaintiff's Affidavit in Response to Defendants' Motion for Summary Judgment, [Docket No. 79], and Plaintiff's Affidavit of Truth, [Docket No. 80], are **STICKEN as untimely filed**;

5. Plaintiff's Affidavit of Fact, [Docket No. 78], Plaintiff's Affidavit of Truth re Jennie Brown, [Docket No. 81], and Plaintiff's Contract Termination Notice, [Docket No. 84], are **STICKEN as filed in error**;

6. Plaintiff's Affidavit in Opposition to Defendants' Motion for Summary Judgment, [Docket No. 86], Plaintiff's Declaration, [Docket No. 87], and Plaintiff's Affidavit order, [Docket No. 88], are **STRICKEN as untimely filed**;

7. Plaintiff's document entitled Defendants' Response to Plaintiff's Interrogatories, [Docket No. 90], is **STRICKEN as untimely filed**;

8. Plaintiff's Affidavit to Amend Response to Defendant's Motion for Summary Judgment, [Docket No. 92], and the second copy of Plaintiff's Affidavit to Amend Response to Defendant's Motion for summary Judgment, [Docket No. 93], are **STRICKEN as untimely filed**;

9. Plaintiff's Amended Complaint, [Docket No. 96], is **STRICKEN as filed in error**;

10. Plaintiff's Affidavit to Amend Complaint, [Docket No. 97], is **STRICKEN as untimely filed**; and

11. Plaintiff's second Application to Proceed in District Court Without Prepaying Fees or Cost, [Docket No. 98], is **DENIED**.

**IT IS HEREBY RECOMMENDED** that:

1. Defendants' Motion for Summary Judgment, [Docket No. 56], be **GRANTED**, as set forth above; and

2. Plaintiff's Complaint be **DISMISSED WITH PREJUDICE**.

Dated: December 6, 2016                     s/Leo I. Brisbois
                                            Leo I. Brisbois
                                            United States Magistrate Judge

**N O T I C E**

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "A party may file and serve specific written objections to a magistrate judge's proposed findings and recommendation within 14 days after being served with a copy of the recommended disposition[.]"  A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing.  If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.